# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

DERRICK BRYANT,
      Plaintiff,

      v.

MERIDEN POLICE DEPARTMENT, et
al.,
      Defendants.

No. 3:13-cv-449 (SRU)

## <u>Ruling on Motion for New Trial</u>

This case arises out of the arrest and subsequent search of Derrick Bryant by members of

the Meriden Police Department.  Bryant alleges that the defendant police officers used excessive

force against him, in violation of state law and 42 U.S.C. § 1983 ("section 1983").  Following a

jury verdict in favor of all the remaining defendants, Bryant moved for judgment as a matter of

law or, in the alternative, a new trial.

For the following reasons, the motion (doc. # 141) is granted in part and denied in part.

## I.    Standard of Review

### A.  <u>Rule 50</u>

Rule 50(a) of the Federal Rules of Civil Procedure allows for the entry of judgment as a

matter of law if a "party has been fully heard on an issue during a jury trial and the court finds

that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party

on that issue . . . ."  Fed. R. Civ. P. 50(a).  If the court does not grant the motion made under Rule

50(a), "the movant may file a renewed motion for judgment as a matter of law" within 28 days

from the entry of judgment or, if the motion concerns a matter not decided by a verdict, within

28 days after discharge of the jury.  Fed. R. Civ. P. 50(b).

A party who fails to move for a judgment as a matter of law under Rule 50(a) is procedurally barred from challenging the verdict through a Rule 50(b) motion after trial. *See Walling v. Holman*, 858 F.2d 79, 82 (2d Cir. 1988) ("Appellants are precluded from challenging the sufficiency of the evidence because they failed to move for a directed verdict at trial in accordance with Fed. R. Civ. P. 50(b)."). The procedural requirement "may not be waived by the parties or excused by the district court." *Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117 (2d Cir. 2004).[1] Nevertheless, a party who has failed to comply with the procedural requirements of Rule 50 is not foreclosed from challenging the verdict by means of a Rule 59 motion. *La France v. N.Y., N. H. & H. R. Co.*, 191 F. Supp. 164, 166 n.1 (D. Conn.), *aff'd*, 292 F.2d 649 (2d Cir. 1961) (treating defendant's motion as a motion made under Rule 59(a) because defendant was procedurally barred from bringing the motion under Rule 50(b)).

B. Rule 59

Under Rule 59, a court may "grant a new trial after a jury trial for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59. Where the movant seeks a new trial "on the grounds that the verdict was against the weight of the evidence," the district court can "weigh the evidence" and is not required to "view it in the light most favorable to the verdict winner." *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124, 133–34 (2d Cir. 1998) (internal quotation marks and citations omitted). A new trial should only be granted, however, if "the court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Kosmynka v. Polaris Indus.*, 462

---

[1] The Second Circuit has recognized a limited exception to the procedural requirement when it is necessary in order to correct "manifest injustice," *see Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005). The court need not consider such an exception when there is no claim of manifest injustice. *See Cotto v. City of Middletown*, 2016 WL 223692, at *14 n.10 (D. Conn. Jan. 19, 2016) (internal citation omitted).

F.3d 74, 82 (2d Cir. 2006).  In reviewing a jury's verdict, the court "should rarely disturb a jury's

evaluation of a witness's credibility."  *DLC Management Corp.*, 163 F.3d at 134 (internal

quotation marks and citations omitted).  Principles of deference, however, do not "override the

trial judge's duty to see that there is no miscarriage of justice."  *Ruffin v. Fuller*, 125 F. Supp. 2d

105, 109 (S.D.N.Y. 2000) (quoting *United States v. Landau*, 155 F.3d 93, 105 (2d Cir. 1998))

(granting plaintiff's Rule 59 motion when no reasonable jury could have examined evidence and

found that plaintiff's constitutional rights were not violated).

## II.  Background

### A. Procedural History

Derrick Bryant filed a complaint against the Meriden Police Department and nine of its

officers on April 2, 2013.  On January 19, 2014, Bryant filed an amended complaint (doc. # 39-

1).  In his amended complaint, Bryant alleged state and federal claims relating to his arrest and

the subsequent search of his person that occurred on March 6, 2011.[2]  Bryant alleged that he was

falsely arrested without probable cause, subjected to the unconstitutional use of excessive force,

and unreasonably searched, both at the scene of the arrest and, later, in a holding cell at the

Meriden Police Department.  Bryant also alleged a *Monell* claim against the Meriden Police

Department and Police Chief Jeffrey Cossette by asserting that they failed to institute adequate

policies and/or procedures in order to prevent the unconstitutional deprivation of civil rights.

On June 29, 2015, I granted in part, and denied in part, the defendants' motion for

summary judgment.  *See* Doc. # 86.  I granted summary judgment in favor of the Meriden Police

Department and Police Chief Jeffrey Cossette on Bryant's *Monell* claim, and I also dismissed

---

[2] At trial the parties testified that the incident occurred on March 9, 2011.  The disparity in dates is of no consequence.

Officer Evan Cossette from the case.  I denied summary judgment with respect to the section 1983 and related state law claims against John Slezak, Dexton Palmer, Kenneth Egan, John Cerejo, Michael Merrigan, and Robert Pekrul, based on a violation of Bryant's Fourth Amendment rights.  Finally, I allowed Bryant's state law claim, filed under Conn. Gen. Stat. § 52-571c against "Officer John Doe," to proceed to trial to the extent that Bryant could identify at trial that Officer Doe was one of the remaining defendants.  Bryant did not move for summary judgment, so I had no occasion to consider whether the officers' use of force against Bryant was unreasonable as a matter of law.

B. <u>Proceedings at Trial</u>

Beginning on April 20, 2016, I conducted a jury trial of the claims against the remaining defendants: Slezak, Palmer, Egan, Cerejo, Merrigan, and Pekrul.  Following Bryant's case-in-chief, the defendants moved for a judgment as a matter of law in accordance with Rule 50(a).  I granted that motion with respect to Pekrul and Merrigan because Bryant had failed to provide sufficient evidence for a reasonable jury to find that they participated in the alleged conduct, either at the scene of the arrest or in the Meriden Police Department holding cell.  *See* Doc. # 124-1.  I reserved ruling on the remaining portion of the defendants' motion.  Following the close of evidence, the defendants filed a renewed motion for judgment as a matter of law, under Rule 50(b), which I took under advisement pending the jury verdict.  *See* Doc. # 129.  At no point in the trial did Bryant move for a judgment as a matter of law.

On April 28, 2016, the jury found all of the remaining defendants—Egan, Cerejo, Palmer, and Slezak—not liable for the alleged unconstitutional use of excessive force and unreasonable search of Bryant.  *See* Doc. # 134.  Judgment entered on May 9, 2016.  *See* Doc. # 137.  On June

6, 2016, Bryant timely moved for a judgment as a matter of law or, in the alternative, a new trial. *See* Doc. # 141.

C. Facts Elicited at Trial

The following is a summary of facts elicited at trial:

On March 9, 2011, Bryant was riding in the passenger seat of a car driven by his friend, Kaonna Potts. Shortly after pulling into the parking lot of the Old Dutch Liquor Store in Meriden, Connecticut, the car was surrounded by four officers of the Meriden Police Department. The officers demanded that the passengers exit the vehicle and then proceeded to take the passengers, including Bryant, into custody. Egan, Cerejo, and Palmer were the only defendants who were involved in the arrest. The officers testified that Bryant was noncompliant with their requests for him to exit the vehicle. While Palmer stood watch over the other passengers who had exited the vehicle, Egan and Cerejo attempted to gain control over Bryant. There was considerable conflicting testimony with regard to exactly how the officers interacted with Bryant. Bryant and other plaintiff's witnesses testified that he was compliant with the officers and that the officers beat him for no reason. Furthermore, Bryant testified that the officers pulled his pants down and strip searched him at the scene of the arrest.

The officers testified that Bryant resisted their attempts to remove him from the vehicle and place him under arrest. Cerejo testified that he punched Bryant multiple times in order to gain compliance. Those strikes were corroborated by other eyewitnesses and could be observed via a partially-obstructed cellphone video that was shown to the jury. During the struggle, Cerejo testified that he observed Bryant attempt to lodge a bag of crack cocaine into his anal cavity. Cerejo also testified that Bryant was unsuccessful in that attempt, but had managed to lodge the bag between the cheeks of his buttocks, where it remained in place until it was

5

removed by officers at the Meriden Police Department.  The officers corroborated Bryant's testimony that, during the arrest, his pants had fallen below his knees, exposing his genitals. They testified that it was the result of Bryant's own attempts to resist arrest and was not, as Bryant testified, the product of the officers' attempt to conduct a strip search at the scene of the arrest.

Following his arrest, Bryant was taken to the Meriden Police Department and placed in a holding cell.  His time in the holding cell was captured by closed-circuit video, which was shown to the jury and used to complement the parties' respective testimony.  In the holding cell, Bryant was handcuffed and had a "spit-mask" placed over his face.  The video and the testimony showed that multiple officers went in to speak with Bryant at various times, and that he was subjected to multiple attempts to search his person.  At times, only a single officer was in the holding cell with Bryant; at other times, there were multiple officers.  The video shows that Bryant was not actively resisting the officers, but also shows the officers suddenly bringing Bryant to the floor and tasing him.

Bryant testified that he was tased more than the single time that the officers admit. Bryant also testified that one of the officers, Egan, stuck his fingers into Bryant's anal cavity. Egan and Slezak testified that no officer performed any type of anal cavity search.  Rather, the officers testified that they were able to retrieve the alleged bag of crack cocaine by reaching in between the cheeks of Bryant's buttocks and pulling the bag out without entering the anal cavity.

## III.    Discussion

Bryant moves for judgment as a matter of law and, in the alternative, for a new trial. Defendants contend that Bryant waived his right to move for a judgment as a matter of law, and

that Bryant is not otherwise entitled to a new trial because the jury's verdict was not against the weight of the evidence.

A. Rule 50

Bryant did not move for a judgment as a matter of law at the close of evidence and thus is barred from making a Rule 50 motion following the jury verdict. *See Walling v. Holman*, 858 F.2d 79, 82 (2d Cir. 1988). Bryant provides no reason why he should be excused from his failure to comply with Rule 50. Accordingly, his Rule 50 motion is denied. *See Cotto*, 2016 WL 223692, at *14 n.10.

B. Rule 59

Bryant alleges that he was subjected to excessive force and an unreasonable search both at the scene of his arrest and subsequently in the holding cell at the Meriden Police Department stationhouse. At trial Bryant supported those allegations with his own testimony to that effect. He also called witnesses who corroborated his testimony regarding what occurred at the scene of his arrest, and he supported his testimony of the conduct in the holding cell by showing a close-circuit video of Egan and Slezak present in the holding cell while he was tased and subjected to a strip search. Bryant testified that he was tased notwithstanding the fact that he was compliant with the officers' orders, and that Egan subjected him to an anal cavity search in which Egan put his fingers inside Bryant's anal cavity.

The defendants, however, told a different story. Based on their account, they applied a reasonable amount of force to accomplish the legitimate law enforcement objectives of (1) securing Bryant's arrest; and (2) forcing Bryant to submit to a search in the Meriden Police Department holding cell.

It is within the province of the jury to weigh the credibility of the witnesses.  Though Bryant is correct that I am not required to examine a Rule 59 motion in the light most favorable to the nonmovant, I also should avoid "disturb[ing] a jury's evaluation of a witness's credibility." *DLC Management Corp.*, 163 F.3d at 134.

1.  *Location of Bag Containing Crack Cocaine*

Bryant makes much of the fact that it is inconceivable that he could have placed a bag of crack cocaine between the cheeks of his buttocks and could have kept it there throughout the ensuing struggle between Bryant, Cerejo, and Egan.  It is not my duty to assess the physical possibility that such an event could occur; that is for the jury to determine.  The jury apparently determined that it was possible for Bryant to place a bag of crack cocaine in between the cheeks of his buttocks while wrestling with and being punched by the defendants, and for that bag to remain there throughout the encounter, which included Bryant standing naked in the parking lot, surrounded by officers.  I will not disturb that finding, as unlikely as it seems, because it is based entirely on a credibility finding by the jury.

2.  *Excessive Force at Scene of Arrest*

Bryant contends that Egan and Cerejo used excessive force when attempting to remove him from the vehicle and bring him into custody.  Bryant testified that he did not resist, yet the officers continued to punch and kick him.  Such testimony is corroborated by eyewitnesses who testified that Bryant was not resisting, and that the officers punched and kicked Bryant multiple minutes before picking him up and placing him in a police cruiser.

The officers told a different story.  Cerejo and Egan both testified that they approached the vehicle for the purpose of arresting the driver and passengers for what they understood to be a drug transaction.  They testified that Bryant was noncompliant with the officer's requests to

exit the vehicle and submit to the arrest.  Specifically, Egan testified that he struck Bryant when he was resisting Egan's attempts to remove him from the vehicle.  Once removed from the vehicle, Cerejo testified that Bryant was constantly trying to free his hands in order to conceal a bag of crack cocaine between the cheeks of his buttocks.  In an attempt to subdue Bryant, Cerejo testified that he first utilized verbal commands, and then, when those commands were yielded no results, he applied punches and kicks.  A partially-obstructed cellphone video corroborated accounts that at least one officer applied several punches to an individual, presumed to be Bryant, lying on the ground.  Palmer did not corroborate Cerejo's and Egan's account, but rather testified that he was preoccupied on the other side of the car, watching over the other passengers who had complied with the officers' requests to exit the vehicle and sit on the ground.  In light of the officers' testimony, a jury could reasonably make the credibility determination that Cerejo and Egan were telling the truth regarding Bryant's noncompliance, and that the officers' use of force against Bryant was not greater than necessary to obtain Bryant's compliance.

### 3.  *Strip Search at Scene of Arrest*

Bryant contends that he was subjected to a strip search at the scene of the arrest. Specifically, he testified that officers pulled down his pants and exposed his genitals while he was lying, and then subsequently standing on the street.  The officers corroborated Bryant's testimony that his pants were down and his genitals were exposed.  The officers contend that Bryant's pants were down because he had been attempting to reach into his waist area in order to hide a bag of crack cocaine in between the cheeks of his buttocks.  They testified that Bryant's numerous attempts to do so had resulted in his pants—and underwear—being pulled down below his waist.  When he was stood up, his pants and underwear were below his waist and his genitals were exposed.  The officers testified that, once Bryant was brought under control, they pulled up

his pants to avoid any further exposure.  A jury could reasonably credit the officers' testimony that Bryant's genitals were exposed as a result of his attempts to free himself from the grips of the police and place a bag of crack cocaine between the cheeks of his buttocks.  The likelihood of events occurring as the defendants described is an issue of credibility for the jury.

### 4.  *Alleged Cavity Search in Holding Cell*

Bryant argues that it was unreasonable, as a matter of law, to subject him to a body cavity search while he was in the Meriden Police Department holding cell.  The evidence does not conclusively establish whether Bryant was subjected to a body cavity search.  The officers present in the holding cell testified that there was not a search of Bryant's anal cavity.  Egan testified that they conducted a strip search of Bryant and were able to remove the bag of crack cocaine from the cheeks of Bryant's buttocks without entering his anal cavity.  The jury was free to believe the officers' testimony that no cavity search occurred.

### 5.  *Taser Use in Holding Cell*

Finally, Bryant argues that he was subjected to excessive force when officers tased him in the holding cell.[3]  Like with the other uses of force in this case, the circumstances that gave rise to the use of a taser are disputed by the parties.  Bryant argues that he was gratuitously tased multiple times when he was in the holding cell.  The defendants contend that he was only tased a single time, and that it was after Bryant had tried to resist being searched.

---

[3] Though Bryant's argument uses language that tracks the Rule 50 standard, I consider the issue in connection with whether Bryant is eligible for a new trial under Rule 59.  *See La France*, 191 F. Supp. at 166 n.1.  Bryant is entitled to a new trial if he can show that it was against the weight of the evidence for a jury to find that he was not subjected to excessive force.  *See Ruffin*, 125 F. Supp. 2d at 105 (granting Rule 59 motion on ground that "no reasonable jury having examined the testimony and evidence could have concluded that plaintiff's constitutional rights were not violated").

There are some facts, however, that were not in dispute.  The jury was not free to disregard the fact that Bryant was tased at least one time when he was being held in the holding cell.  At trial, both parties testified to the fact that Slezak tased Bryant (at least once), approximately an hour after his initial arrest, and immediately after Bryant had been tackled to the floor by Slezak and another officer.  Further, the closed-circuit video showed that Bryant was tased as two additional officers entered the room to assist in pinning an already-handcuffed Bryant to the floor.  Pl.'s Ex. 12 at 16:26:19.  Based on those undisputed facts, I evaluate whether it was against the weight of the evidence for the jury to find that Bryant was not subjected to excessive force when he was tased while handcuffed in the holding cell.

To assess whether an officer's conduct constitutes excessive force, I must first determine the appropriate standard to apply.  There is no blanket constitutional prohibition on the use of force against an individual.  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2477 (2015) (Scalia, J., dissenting).  Rather, an individual is protected by different constitutional provisions depending on his or her status at the time the force was used.  *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989).  Everyone agrees that, after an individual has been convicted of an offense, an individual may challenge the use of excessive force under the Eighth Amendment's prohibition against cruel and unusual punishment.  *See id.* (citing *Whitley v. Albers*, 475 U.S. 312, 326 (1986)).  Prior to conviction, the use of excessive force is prohibited by the Fourth Amendment's prohibition against unreasonable "seizures," (i.e., arrests), *see id.*, and the Fifth Amendment's "protection against deprivation of liberty without due process of law," *Bell v. Wolfish*, 441 U.S. 520, 536 (1979).

In *Graham v. Connor*, the Supreme Court held that an arrestee is protected under the Fourth Amendment and not "the more generalized notion of 'substantive due process'" derived

from the Fifth Amendment. *Graham*, 490 U.S. at 395. The Court also noted that, at some point after an individual's arrest, the suspect's status changes from an arrestee to a pretrial detainee. *See id.* at 395 n.10. At that point, the individual may seek protections under the due process clauses of the Fifth and Fourteenth Amendments. *See id.*; *Kingsley*, 135 S. Ct. at 2476 (discussing pretrial detainee's excessive force claim in context of Fourteenth Amendment). Accordingly, the period of time between arrest and conviction operates as "something of a legal twilight zone" in which it is often difficult to determine the appropriate standard to apply. *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000).

Though circuits remain split on the issue, the Second Circuit has held that "the Fourth Amendment standard probably should be applied at least to the period prior to the time when the person arrested is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer." *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989); *see also Bennett v. Britton*, 609 F. App'x 11, 12 (2d Cir. 2015) (quoting *Graham*, 490 U.S. at 395) ("A claim under 42 U.S.C. § 1983 that a law enforcement officer used excessive force on a suspect before arraignment is 'analyzed under the Fourth Amendment and its "reasonableness" standard.'").[4] Courts within the circuit generally apply the Fourth Amendment to all claims of excessive force prior to the individual being arraigned or formally charged. *See Lewis v. Clarkstown Police Dep't*, 2014 WL 6883468, at *4 (S.D.N.Y. Dec. 8, 2014); *Castellar v. Caporale*, 2010 WL 3522814, at *6–7 (E.D.N.Y. Sept. 2, 2010); *Thompson v. City of Meriden*, 1999 WL 301693, at *6 (D. Conn. Apr. 14, 1999).

---

[4] This approach is supported by a recent Supreme Court decision in which the Court held that "the Framers 'drafted the Fourth Amendment' to address 'the matter of pretrial deprivations of liberty[.]'" *Manuel v. City of Joliet, Ill.*, — U.S. ——, 2017 WL 1050976, at *6 n.8 (U.S. Mar. 21, 2017) (quoting *Albright v. Oliver*, 510 U.S. 266, 274 (1994)). In the context of challenging the legality of a suspect's pretrial detention, the Court held that the Fourth Amendment "governs a claim for unlawful pretrial detention even beyond the start of legal process[.]" *Id.* at *7.

In the instant case, the alleged use of excessive force in the Meriden Police Department holding cell occurred following Bryant's arrest and before he was arraigned or formally charged. Accordingly, Bryant's excessive force claim is appropriately analyzed under the Fourth Amendment.

The Fourth Amendment "prohibits the use of unreasonable force and therefore excessive force by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). The reasonableness inquiry is an objective standard that requires a court to balance "the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." *Tracy*, 623 F.3d at 96 (internal citations and quotation marks omitted). A court evaluates the nature and quality of the intrusion on the plaintiff's Fourth Amendment rights by examining the effect that the use of force has on the individual. *Garcia v. Dutchess Cty.*, 43 F. Supp. 3d 281, 290–91 (S.D.N.Y. 2014), *aff'd in part, dismissed in part sub nom. Garcia v. Sistarenik*, 603 F. App'x 61 (2d Cir. 2015). To evaluate the governmental interests at stake, a court must consider: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect pose[d] an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *See Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 396).[5]

---

[5] The circumstances of *Graham* are such that these factors were devised in the context of an officer making an arrest in the field. Nevertheless, courts have consistently applied the *Graham* factors to Fourth Amendment claims based on officers' conduct at the stationhouse. *Blake v. Base*, 1998 WL 642621, at *12 (N.D.N.Y. Sept. 14, 1998); *Franks v. New Rochelle Police Dep't*, 2015 WL 4922906, at *10 (S.D.N.Y. Aug. 18, 2015); *Castellar*, 2010 WL 3522814, at *6–7. The primary differences between the use of force in the field and at the stationhouse is that, at the stationhouse, the danger to the public and the threat of escape is significantly diminished. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (possibility that individual will escape or commit further crimes diminished once he is detained); *but see Blake*, 1998 WL 642621, at *13 (use of force while defendant was already detained is justified when detainee is "extremely violent and a possible escape risk").

Those three factors, known as the *Graham* factors, must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Tracy*, 623 F.3d at 96. Though an officer is not required to use the least amount of force necessary to accomplish a law enforcement objective, the use of force must at least be "reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier*, 225 F.3d 161, 165–66 (2d Cir. 2000).

       a.   Nature and quality of intrusion on Bryant's rights

Generally speaking, a taser can be used in two different ways: drive-stun mode and dart-stun mode. Dart-stun mode is used to describe a taser that shoots physical "barbs" (typically made with a combination of aluminum and steel) into the subject's body. *Bryan v. MacPherson*, 630 F.3d 805, 824 (9th Cir. 2010). Once the barbs have pierced the skin, an electrical current is sent from the taser into the individual's body, which causes pain and temporary paralysis "throughout the body." *Id.* "When a taser is used in [drive-]stun mode, an electrical current is sent to the muscles in the area against which the weapon is pressed." *Garcia*, 43 F. Supp. 3d at 290. The electrical current causes the subject pain and temporarily inhibits—or paralyzes—the individual's muscles in the affected area. *See Whitfield v. City of Newburgh*, 2015 WL 9275695, at *11 (S.D.N.Y. Dec. 17, 2015); *see also* Bailey Jennifer Woolfstead, *Don't Tase Me Bro: A Lack of Jurisdictional Consensus Across Circuit Lines*, 29 T.M. Cooley L. Rev. 285, 292–93 (2012). The Ninth Circuit is the only circuit that has distinguished between the use of drive-stun and dart-stun mode. *See* Woolfstead, *supra*, at 318.

Though the Second Circuit has yet to rule on the issue, district courts within the Circuit have concluded that, regardless of whether it is in drive-stun or dart-stun mode, the use of a taser

14

constitutes a "significant degree of force" that is akin to pepper spray.  *Whitfield*, 2015 WL
9275695, at *11; *Garcia*, 43 F. Supp. 3d at 290–91; *Read v. Town of Suffern Police Dep't*, 2013
WL 3193413, at *8 (S.D.N.Y. June 25, 2013) (taser is a "serious intrusion into the core of the
interests protected").  Some courts have noted that the use of a taser constitutes a greater degree
of force than the use of pepper spray because tasers pose a greater risk of injury.  *Whitfield*, 2015
WL 9275695, at *11; *see also Beaver v. City of Fed. Way*, 507 F. Supp. 2d 1137, 1146 (W.D.
Wash. 2007), *aff'd*, 301 F. App'x 704 (9th Cir. 2008).

> b.   Governmental interest in the use of force

In order to justify use of a taser, the governmental interest in the use of force must
outweigh a suspect's interest in being free from the use of that degree of force.  *See Graham*, 490
U.S. at 396.  To evaluate the government's interest in the use of force, the *Graham* Court
instructs courts to consider, inter alia, "the severity of the crime at issue, whether the suspect
poses an immediate threat to the safety of the officers or others, and whether he is actively
resisting arrest or attempting to evade arrest by flight."  *Id.*

The severity of the crime of arrest is relevant to the officer's decision to use force
because it often serves as a proxy for potential consequences arising out of the suspect's refusal
to submit to an arrest.  *Whitfield*, 2015 WL 9275695, at *12.  Often officers arrive at an actively
unfolding scene in which they are unable to assess the dangerousness of the person except by
evaluating the nature of the crime that the police believe the person committed.  Accordingly, an
officer's use of force against a person suspected of committing a dangerous crime is more likely
to be deemed reasonable than the use of force against a person suspected of committing a minor
offense.  *Compare Whitfield*, 2015 WL 9275695, at *12 (individual high on drugs and suspected

of domestic violence posed threat), *with Crowell v. Kirkpatrick*, 400 F. App'x 592, 594 (2d Cir. 2010) (individual arrested for trespass posed little threat).

A court must be careful, however, to avoid putting too much emphasis on the seriousness of the suspected criminal activity. *See Hemphill v. Schott*, 141 F.3d 412, 417 (2d Cir. 1998). Doing so "thwart[s] a central purpose of the Fourth Amendment limitations on use of force in making arrests, which is to preserve determination of guilt and punishment for the judicial system." *Id.* The seriousness of the suspected crime as a proxy for the need to use force becomes less helpful as more time passes between the initial interaction and the use of force. *See id.* Although an officer may initially assume that an individual suspected of a dangerous crime poses a threat to the officer and others, the officer may not ignore evidence that indicates the threat has diminished. *Id.* (officer not justified shooting individual suspected of assault with deadly weapon after officer observed individual stop and raise hands in air).

Though the Second Circuit has not yet ruled on the issue, many courts have viewed the "immediate threat to the safety of the officers or others" as the most important *Graham* factor. *See A.K.H. v. City of Tustin*, ⸺ F.3d ⸺, 2016 WL 4932330, at *4 (9th Cir. Sept. 16, 2016) (quoting *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)). After all, it is the "need for force which is at the heart of the *Graham* factors." *Blankenhorn v. City of Orange,* 485 F.3d 463, 480 (9th Cir. 2007) (internal quotation marks omitted). In circumstances when a suspect has already been subdued and there is no longer a serious risk of flight, the primary justification for the use of force is to protect officers from any danger that the suspect poses.

Courts assessing the threat to officer safety look both to the officers' statements about their perception of a threat and objective factors that would justify such a fear. *Mattos*, 661 F.3d at 441–42. The assessment must be made based on facts that existed at the moment of the tasing

itself. *Garcia*, 43 F. Supp. 3d at 291–92. The fact that the suspect is restrained or the presence

of other officers will often diminish a suspect's objective threat to the officers. *See Tracy*, 623

F.3d at 99 (fact that suspect was handcuffed weighed against finding of immediate threat);

*Whitfield*, 2015 WL 9275695, at *11 (any previous threat to officers had "dissipated" when

suspect was "cornered in living room by several officers"); *Garcia*, 43 F. Supp. 3d at 291–92

(taser excessive when officers testified that it took "only seconds" to accomplish goal of forcing

suspect to ground and restraining him); *Beaver*, 507 F. Supp. 2d at 1146 (presence of additional

officer made use of taser excessive even though prior uses were justified); *Roberts v. Manigold*,

240 F. App'x 675, 677–78 (6th Cir. 2007) ("gratuitous use of force on a suspect who has already

been subdued and placed in handcuffs is unconstitutional"); *see also Brown v. City of Golden

Valley*, 574 F.3d 491, 498 (8th Cir. 2009) (presence of multiple officers diminished threat and

justification to use taser). Furthermore, the presence or absence of a weapon at the time of the

alleged use of force will help determine the level of threat that the officers faced. *Garcia*, 43 F.

Supp. 3d at 291–92 (tasing of suspect was excessive when there was no evidence that suspect

was in possession of weapon or could access one after being force by officers to the ground).

Finally, the location of the suspect—in rapidly unfolding and uncertain situations out in the

public as contrasted with a heavily regulated environment like a police station—will help assess

the level of threat that the officers faced. *Compare Crowell*, 400 F. App'x at 595 (tasing

reasonable when suspects' compatriots were rapidly approaching, creating a "degree of urgency"

requiring officers' to take them into custody quickly), *with Vasquez v. Gempeler*, 2008 WL

2953566, at *2 (W.D. Wis. July 29, 2008) (tasing unreasonable if defendants "fail to explain how

a fully restrained prisoner posed a danger requiring the use of a powerful electric shock").

For example, in *Beaver*, a lone officer who caught a suspect fleeing the scene of a burglary was justified in using a taser to subdue the suspect. *Beaver*, 507 F. Supp. 2d at 1140. The Court held that the officer's initial use of the taser was reasonable under the circumstances because, at the time of the tasing, the officer was alone and the suspect attempted to flee, appeared to be under the influence of drugs, and refused the officer's commands to stop. *Id.* at 1145. The Court distinguished the first three uses of the taser from the two subsequent tasings, which occurred after another officer had arrived at the scene. *Id.* The presence of the other officer diminished the immediate threat to the first officer. *Id.* ("To the extent that [the suspect] posed an 'immediate threat' to [the initial officer] . . . that threat was significantly diminished when [the other officer] arrived to provide backup."). The arrival of the other officer also gave the officers multiple, less-invasive options for bringing the defendant into custody. *Id.* The subsequent tasings were excessive because, after the arrival of the other officer, the suspect no longer posed a threat that was significant enough to warrant the use of a taser. *Id.*

In *Garcia*, the Court held that a jury could reasonably find that an officer was not justified in using a taser on a suspect who was tased after he had already been brought to the floor. *Garcia*, 43 F. Supp. 3d at 292. The Court focused on the fact that the suspect was cornered in a room by multiple officers who were able to bring him to the floor without the use of a taser. *Id.* at 291–92. By the time the taser was used, the threat that the suspect could access a weapon had dissipated and any claim of "immediate threat" was belied by the fact that the officers had clear control over the situation. *Id.*

The final *Graham* factor that is used to analyze the reasonableness of an officer's use of force is the whether the suspect is actively resisting or attempting to evade arrest.[6]  Like the other factors, a suspect's level of resistance must be viewed at the time of the use of force.  *Garcia*, 43 F. Supp. 3d at 293 ("[R]egardless of whether [the suspect] actively resisted arrest such as fighting back at some point before being brought to the kitchen floor, that conduct does not necessarily justify the later use of the Taser once [the suspect] was on the floor." (internal quotation marks and citations omitted)); *see also Bryans v. Cossette*, 2013 WL 4737310, at *8 (D. Conn. Sept. 3, 2013) (unreasonable to tase subdued suspect).

When there is no evidence that a suspect was attempting to escape police custody at the time he was tased, *see Blake*, 1998 WL 642621, at *13 (danger of escape from custody justified taser use), the only relevant question is whether the suspect was otherwise actively resisting the officers' attempts to bring him within their control.  Courts have distinguished between active resistance and passive resistance.  *Compare Bryan*, 630 F.3d at 832; *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1282 (10th Cir. 2007); *Orell v. Muckle*, 2012 WL 3231017, at *3 (D. Conn. Aug. 6, 2012); *and Nelson v. City of Stamford*, 2012 WL 233994, at *6 (D. Conn. Jan. 25, 2012) (passive resistance does not justify taser use), *with MacLeod*, 548 F. App'x at 8; *and Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (active resistance justifies taser use).  The more active the resistance, the more likely that an officer will be justified in using force to control the suspect.  *See Hagans*, 695 F.3d at 509.

A suspect who tenses up his or her body, making it more difficult for law enforcement to force the suspect to comply with its request, may be considered to be passively resisting arrest.

---

[6] As discussed earlier, in the context of excessive force when the suspect is already at the stationhouse, the relevant question is the extent to which the suspect is actively resisting officers or attempting to escape the conditions of his confinement.  *See Blake*, 1998 WL 642621, at *13.

*See Garcia*, 43 F. Supp. 3d at 293–94 (after officers were already on top of suspect, resistance "limited to making it more challenging for the officers to handcuff him" does not constitute actively resisting arrest).  Without more, the frustration of an officer's attempts to gain compliance—such as forcing a suspect to exit a vehicle—does not constitute active resistance. *See Mattos*, 661 F.3d at 445 (tasing excessive when suspect posed no threat and only resisted officer's requests to exit vehicle); *Brown*, 574 F.3d at 497 (taser unjustified when used for sole purpose of forcing suspect to exit vehicle); *see also Gravelet-Blondin v. Shelton,* 728 F.3d 1086, 1092 (9th Cir. 2013), *cert. denied,* ⸺ U.S. ⸺, 134 S. Ct. 1292 (2014) (suspect who "continually ignored officer commands to remove his hands from his pockets" and to produce his hands for handcuffing was not "particularly bellicose," so "the third *Graham* factor offered little support for the use of significant force against him"); *Marzullo v. Onofrio*, 2016 WL 4250224, at *4 (D. Conn. Aug. 10, 2016) (jury could reasonably find that tasing violated Fourth Amendment when plaintiff's evidence showed that man was tased for refusing to comply with officer's requests to exit vehicle); *Nelson*, 2012 WL 233994, at * 6 (tasing potentially unreasonable if jury determines that suspect was "merely passively resisting arrest when a Taser was applied to his body").  In contrast, the use of a taser is appropriate in circumstances when an actively non-compliant suspect's resistance "posed a real and imminent threat to the safety of the officers and any bystanders."  *MacLeod*, 548 F. App'x at 8.

Finally, the use of a taser on a suspect who is already in police custody at the stationhouse will be given more scrutiny.  *See Stephens*, 509 F. Supp. 2d at 1112.  In *Stephens*, the Court held that multiple tasings of a confined suspect would be improper if it were done for the purpose of forcing him to "change clothes in order to facilitate his incarceration."  *Id.*  Unlike a suspect who is detained out in the public, a noncompliant suspect inside the stationhouse and in

the presence of multiple officers is very unlikely to be able to get away or do any particular

harm.  *Id.*

Though the *Graham* factors "guide the court's inquiry," the ultimate question of

"reasonableness" is fact-dependent.  *Garcia*, 43 F. Supp. 3d at 290.  Courts have endorsed

consideration of additional factors, including: (1) the existence of less intrusive means of

accomplishing the law enforcement objective, *see Beaver*, 507 F. Supp. 2d at 1146, (2) the nature

and quality of any warnings that preceded the use of force, *see Crowell*, 400 F. App'x at 595, and

(3) the law enforcement objective justifying the use of force, *see Stephens*, 509 F. Supp. 2d at

1112.

In *Bryan*, the Court held that an officer's failure to warn a suspect prior to the use of a

taser and the existence of alternative means to effectuate the arrest both "militate[d] against" a

finding that the use of force was reasonable."  *Bryan*, 630 F.3d at 831.  The Court held that a

warning was "feasible" and would have given the suspect an opportunity to submit to the

officer's requests.  *Id.*  Moreover, additional officers arriving to the scene made it more likely

that the suspect's compliance could be secured using something less than an intermediate use of

force, *id.*, and the availability of alternative means of ensuring compliance made the officer's

conduct less reasonable.  *See id.*; *see also Sullivan*, 225 F.3d at 165–66 (officer not required to

use least intrusive means, but availability of alternative means makes greater degrees of force

appear less reasonable); *Roberts*, 240 F. App'x at 676 (tasing unreasonable in part because the

defendant did not wait to see if the other officer had successfully subdued the suspect before

using the taser, even though the defendant admitted that the other officer would have been able

to subdue the suspect without the defendant's assistance).

In contrast, the *Crowell* Court affirmed the district court's holding that the officer's use of a taser was objectively reasonable, specifically noting that the taser was employed only as a "last resort." *Crowell*, 400 F. App'x at 595. The officers had already warned the suspects and had attempted to use other means to effectuate the arrest. *Id.* When faced with a rapidly unfolding situation in which it was necessary to accomplish the arrest as soon as possible, the officers were justified in raising the level of force applied to the suspects by tasing them. *Id.*

In situations in which a suspect is uncooperative but not dangerous or threatening, some courts have held that officers cannot use a taser as a compliance mechanism. *See Stephens v. City of Butler, Ala.*, 509 F. Supp. 2d 1098, 1111–12 (S.D. Ala. 2007), *aff'd sub nom. Stephens v. Lovette*, 261 F. App'x 240 (11th Cir. 2008); *Mahamed v. Anderson*, 2009 WL 873534, at *5 (D. Minn. Mar. 30, 2009). Other courts have held that taser use can be permissible in the absence of a threat to officers or others. *See Pennington v. Terry*, 2015 WL 998206, at *6 (M.D. Tenn. Mar. 6, 2015), *aff'd on other grounds*, 644 F. App'x 533 (6th Cir. 2016); *Boyden v. Twp. of Upper Darby*, 5 F. Supp. 3d 731, 738 (E.D. Pa. 2014). For example, courts have held that officers may use a taser in order to prevent an individual from secreting evidence into his body. *Id.* The use of a taser in that context is often justified by the fact that the individual's conduct, such as swallowing dangerous narcotics, threatened his own safety. *Id.* Other times, courts have held that taser use is permissible because the suspect has no constitutional right to destroy evidence. *Id.*; *see also Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 315 (S.D.N.Y. 1998) (officer not unreasonable to spray pepper spray into suspect's mouth when officer had reasonable belief that suspect was about to swallow contraband).

c.   Weighing the Competing Fourth Amendment Interests

Weighing the interests of Bryant to be free from unreasonable use of force with the officers' legitimate interest in securing him while protecting their safety, I begin with the conclusion that the use of a taser constitutes a significant degree of force.  Bryant testified that the use of the taser caused him tremendous pain and the officers testified that it led to Bryant relaxing his muscles—perhaps involuntarily—and ultimately complying with their controlled strip search.  That use of force will only be justified if, after weighing the *Graham* factors and additional considerations, the officers' legitimate interests outweigh Bryant's interest in being free from a significant degree of force.

Examining the first factor, I conclude that the seriousness of Bryant's offense does not support the government's interest in tasing him.  Bryant was arrested and eventually charged with simple possession of narcotics, not with distribution or with possession with intent to distribute.  Even if it was reasonable for the officers to view Bryant as a danger to themselves and others at the scene of the arrest, that danger had dissipated by the time Bryant was brought to the Meriden Police Department holding cell.  At that point, Bryant had not offered any resistance since his arrest and the officers, having found nothing during the arrest, had no reason to believe he was armed.  Unlike a suspect on the street who is judged by the crime he committed (i.e., the only thing that the officers on the scene know about him), Bryant had been in custody for a substantial amount of time before he was tased.  Accordingly, the arresting officers were able to gauge Bryant's level of dangerousness based on his conduct and not the crime of arrest.

Looking at the second factor, the videotape shows conclusively that Bryant posed no immediate threat to the officers or others at the time of the tasing.  At that time, Bryant had been in the Meriden Police Department holding cell for approximately five minutes (according to the closed-circuit video) and had been in police custody for approximately an hour.  His hands were

23

handcuffed in the front of his body and he had a "spit-mask" on to prevent him from secreting anything out of his mouth.  The closed-circuit videotape of the holding cell shows that, prior to the tasing, multiple officers had interacted with Bryant without incident.  At various times, officers walked into the cell, spoke with Bryant for a few seconds or minutes, and then walked out.  Some of those instances involved an individual officer who interacted with Bryant when the two were alone in the holding cell.  The video confirms that Bryant posed no threat to the officers individually or collectively while handcuffed in the holding cell.

Approximately five minutes into the closed-circuit video, Slezak walked in and approached Bryant who was standing up against the wall, restrained by one of the other officers. Slezak testified that his purpose was to get Bryant to comply with a controlled strip search for contraband on his person.  Slezak testified that he brought a taser into the cell for the purpose of encouraging Bryant to submit to the search.  At one point, the video shows Slezak bring the taser extremely close to Bryant's body.  Pl.'s Ex. 12 at 16:25:11.  The video shows Slezak hold the taser close to Bryant's body for about twenty seconds, after which the video shows Bryant slump over.  Pl.'s Ex. 12 at 16:25:32.  Slezak testified that he did not tase Bryant at that point, but that he merely held the taser close to Bryant to threaten him.  Bryant testified that he was tased at this point.  The videotape evidence is consistent with the testimony of both witnesses, so it is impossible to know whether a tasing actually occurred at that point.

Regardless, what happened next is undisputed.  After seeing Bryant make what the officers described as a movement of his hands towards his groin area, Egan swiftly brought Bryant to the ground.  Pl.'s Ex. 12 at 16:26:18.  Two other officers standing outside the holding cell responded immediately and added additional assurance that Bryant could not move from his pinned position.  *Id.*  As the two additional officers rushed into the cell, Slezak tased Bryant.

Pl.'s Ex. 12 at 16:26:19. When he was tased, Bryant had already been in custody for approximately one hour. He was on the floor of a holding cell, handcuffed, and surrounded by two—and what soon became four—officers.[7] The closed-circuit video shows no evidence that Bryant offered any degree of active resistance at any time. Though the officers testified that they feared he had something in his pants that he was trying to access, there is no evidence that they reasonably believed Bryant to be in possession of a weapon. None of the officers testified that it was difficult to take Bryant to the ground, and there was no evidence that Bryant resisted after he was brought to the floor and pinned by Egan and Slezak. As a result, there was no evidence that Bryant posed any threat, let alone an immediate threat, to the officers at the time of the tasing.

This case is similar to *Stephens v. City of Butler, Ala.*, in which the Court held that the use of a taser would not be justified when, though the suspect was arguably noncompliant, he was "unarmed, in the confines of a small room at the jail, surrounded by three police officers," and "made no physically threatening movement . . . ." 509 F. Supp. 2d at 1111–12. The Court noted that the threat to the officers was diminished by the fact that he was not "actively resisting arrest or attempting to flee from the interior room in the jail." *Id.* at 1112. Similarly, in *Mahamed v. Anderson*, the Court held that tasing was improper when a suspect held in a jail cell "was uncooperative but not dangerous or threatening[.]" 2009 WL 873534, at *5.

This is not a case in which the officers encountered a rapidly unfolding and uncertain situation. *See MacLeod v. Town of Brattleboro*, 548 F. App'x 6, 8 (2d Cir. 2013); *Campos v. City of Glendale*, 2007 WL 4468722, at *4 (D. Ariz. Dec. 14, 2007). It was not reasonable to

---

[7] The fact that a suspect is handcuffed does not necessarily preclude the use of a taser. *See Buckley v. Haddock*, 292 F. App'x 791, 795 (11th Cir. 2008). A suspect who is handcuffed yet posing a continuing threat to the officers—for example, by violently kicking the officer—may still pose a sufficient threat to justify the use of a taser. *Id.* However, in this case, the defendants produced no evidence that Bryant continued to resist after being taken to the ground by the officers, and the video shows no such resistance.

believe that Bryant posed a threat to officer safety.  Had officers feared that Bryant was armed, they would have not walked into and out of the holding cell alone.  Nor was this a situation in which a single officer was faced with an actively noncompliant suspect.  Rather, the defendants faced a situation in which a suspect was in the custody of multiple officers and was, at worst, passively resisting the officers' efforts to conduct a controlled strip search for contraband.

Regarding the third factor, the videotape shows that Bryant was not offering any active resistance at the time he was tased.  During the few minutes that preceded the officers' takedown of Bryant, officers were walking in and out of the holding cell.  At times, single officers were alone with Bryant in the cell.  Pl.'s Ex. 12 at 16:20:43, 16:23:46.  At no point prior to the moments immediately preceding Bryant's takedown did Bryant make any movement that could be construed as an attempt to actively resist his conditions of confinement.  Though Slezak testified that he only tased Bryant once, the videotape showed and Slezak admitted he activated the taser prior to time he admits to tasing Bryant.  Pl.'s Ex. 12 at 16:25:11.  Perhaps coincidentally, Bryant slumped over immediately after the activated taser drew close to his body.  Pl.'s Ex. 12 at 16:25:32.  Whether or not he was tased at that moment, the fact that he slumped over and then resumed his standing position is not the type of resistance that the *Graham* Court contemplated when it used the phrase "actively resisting."

A minute later, as Bryant was standing up against the wall, flanked by two officers, Egan testified that Bryant began reaching into his pants.  On the closed-circuit video, Bryant makes a movement that could be interpreted as reaching into his pants.  At that moment, Egan forcibly took Bryant to the floor.  Because he was already handcuffed and neither swinging his arms nor kicking his legs, the takedown (in the presence of two trained officers) was swift and effective.  There was no evidence that Bryant continued to squirm or otherwise resist officer's attempts to

subdue him after being taken to the ground.  Nevertheless, Slezak used the taser just as additional officers arrived to ensure that Bryant would be adequately restrained.  This is not a case in which the use of a taser was justified because lesser degrees of force had been unsuccessful.  *See* *Campos*, 2007 WL 4468722, at *4 (tasing reasonable when previous application of physical force did not succeeded in bringing about suspect's compliance).  Rather, it is a case like *Stephens*, in which a passively resisting individual was tased even though he was in a holding cell, surrounded by multiple officers, and posed no threat of escape.  509 F. Supp. 2d at 1113. Given those facts, a jury could at most find that Bryant was offering passive resistance to the officer's desire to search him.

Finally, the additional considerations—apart from the *Graham* factors—further weaken a conclusion that the tasing was justified.  First, there is no indication that the officers made any serious attempts to force Bryant to submit to a search before the use of the taser. Notwithstanding the fact that the closed-circuit video shows as many as four officers interacting with Bryant in the holding cell, at no point did the officers attempt to physically force Bryant to submit to a search.  The presence of multiple officers made the alternative means more feasible and made the failure to use such means less reasonable.

Second, the defendants admitted that the law enforcement objective of the taser use was to gain compliance with the strip search—not to protect officers in a volatile situation.  I need not decide whether the use of a taser is justified to prevent the imminent destruction of evidence because, in the instant case, there was no risk of such imminent destruction.  The officers testified that the bag of crack cocaine was lodged between the cheeks of Bryant's buttocks.  If so, it had been in that position for more than an hour, and there was no testimony regarding any immediate need to recover it.  The closed-circuit video showed that the officers exhibited no

degree of urgency in the five minutes preceding the taser use.  Even if a taser could be used for the sole purpose of forcing a suspect to submit to a search, its use is not reasonable when there is no degree of urgency to the search.

The taser is a powerful mechanism that enables officers to use significant, ordinarily non-lethal, force to protect themselves and others.  *Garcia*, 43 F. Supp. 3d at 290.  It is not a tool that can be used to punish already-restrained individuals for refusing to accede to an officer's demands, especially when more reasonable alternatives exist.  *See Roberts*, 240 F. App'x at 676; *Whitfield*, 2015 WL 9275695, at *15; *Stephens*, 509 F. Supp. 2d at 1113.  Furthermore, it is not a tool that can be used to shield officers from "any possibility of harm"—no matter how slight. *Beaver*, 507 F. Supp. 2d at 1146 (key inquiry is whether suspect poses "'immediate' threat, not 'possible' threat").

At trial, the defendants made a point to emphasize that the use of the taser proved successful because it led to the officers finding crack cocaine in between the cheeks of Bryant's buttocks.  Def.'s Obj. to Rule 59 Mot. at 15 (doc. # 142).  Egan testified that the taser caused Bryant to relax his muscles, which caused the bag of crack cocaine to "fall out" of his backside. In the defendants' view, the taser was justified because it produced the officers' desired result— it led to the recovery of contraband.  The fact that the officers ultimately found contraband after the taser was used, however, does not help establish the existence of any one of the *Graham* factors.

Furthermore, any contention that the taser was used for purely officer-safety purposes is belied by the fact that, at the time the taser was initially brought into the cell, there was no immediate threat to officer safety.  Pl.'s Ex. 12 at 16:25:11.  Immediately prior to the taser being brought into the cell, an officer can be seen interacting with Bryant individually—without the

28

presence of other officers and without a taser or other instrument that would help protect the officer if he encountered a threat.  Had the officers truly believed that Bryant posed a serious threat to their safety, they would not have casually entered the holding cell with him, often without the assistance of an additional officer.  Rather, Slezak testified that he brought the taser into the cell to convince Bryant to submit to a search.  The taser was wielded as a compliance mechanism in the face of a suspect who did not want to submit to a search.  It was not used as a tool for officer protection.

Faced with a suspect who they believed had something secreted between the cheeks of his buttocks, it would have been reasonable to place Bryant in a dry cell and wait until either he submitted to a search or released the drugs on his own volition.  It was not reasonable to tase Bryant merely to speed up the process.  Having evaluated the *Graham* factors and additional considerations, I hold that it was against the weight of the evidence for a jury to find that Slezak's use of the taser was reasonable under the circumstances.  For the same reason, it is also against the weight of the evidence to find that Egan, unquestionably in a position to intervene, is not liable for failing to intervene in Slezak's unreasonable use of force.  The jury verdict in favor of those defendants represented a "seriously erroneous" result justifying a new trial.

## C.  Qualified Immunity

Even though it was against the weight of the evidence for a jury to find that Slezak's use of the taser was justified, I will only grant a new trial if Slezak's use of a taser was in violation of clearly established law.  If not in violation of clearly established law, Slezak and Egan, the other defendant officer present during the tasing, are protected by the doctrine of qualified immunity.

Qualified immunity enables governmental officials who perform discretionary functions to be shielded from liability for civil damages so long as "their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."
*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The defendant bears the burden of establishing
that he or she is entitled to qualified immunity.  *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015)
(citing *Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013)).

Courts typically frame the qualified immunity analysis by requiring the defendant to
establish one of two conditions: that "(a) the defendant's action did not violate clearly
established law, or (b) it was objectively reasonable for the defendant to believe that his action
did not violate such law." *Garcia*, 779 F.3d at 92 (quoting *Russo v. City of Bridgeport*, 479 F.3d
196, 211 (2d Cir. 2007)).

"To be clearly established, a right must be sufficiently clear that every reasonable official
would have understood that what he is doing violates that right."  *Taylor v. Barkes*, 135 S. Ct.
2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)); *see also*
*McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) ("For a right to be clearly
established, the contours of the right must be sufficiently clear that a reasonable official would
understand that what he is doing violates that right.").  Though there need not be a case directly
on point, "existing precedent must have placed the statutory or constitutional question beyond
debate." *Taylor*, 135 S. Ct. at 2044 (internal quotation marks and citations omitted).

Even if a court determines that a right is clearly established, qualified immunity will
protect a government official "if it was objectively reasonable for the official to believe that his
acts did not violate those rights."  *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000) (quoting
*Russell v. Coughlin,* 910 F.2d 75, 78 (2d Cir. 1990)) (alterations omitted).  The inquiry is "not
whether the [official] *should have* acted as he did . . . [i]t is instead whether *any* reasonable
[official], out of the wide range of reasonable people . . . *could have* determined that the

challenged action was lawful." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (emphasis in original).

The events at issue took place on March 9, 2011. At that time, neither the Second Circuit nor Supreme Court had published a decision regarding the use of force involving tasers. *See* Woolfstead, *supra*, at 305. "[T]he absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." *McGowan*, 825 F.3d at 124 (*quoting* Garcia, 779 F.3d at 92 (internal quotation marks, alterations, and citations omitted)). For that reason, "[a]n officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury." *Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014). A defendant "can still be on notice that [his] conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

On March 9, 2011, the clearest statement of the law in the Second Circuit regarding the use of a level of force akin to that of a taser was *Tracy* v. *Freshwater*, 623 F.3d at 98. In *Tracy*, the Second Circuit held that it was objectively unreasonable for an officer to use pepper spray "mere inches away from the face of a defendant already in handcuffs and offering no further active resistance." *Id.* at 98. Like the officers in *Tracy*, Slezak was faced with a suspect who was already in handcuffs and was no longer offering active resistance. If anything, Bryant posed even less of a threat than the suspect in *Tracy* because he was in a holding cell and had not, immediately prior to the challenged use of force, attempted to escape. *See id.* at 98. A reasonable officer in Slezak's position would be aware that he could not use a significant degree

of force on a confined individual who posed no threat and offered no active resistance.  *See Powell*, 891 F.2d at 1044 (officer's use of force not objectively reasonable when pretrial detainee was assaulted notwithstanding the fact that he made no effort to resist).

Like other courts before me, I hold as a matter of law that it was clearly established in March 2011 that officers could not employ a significant degree of force, such as a taser, against a suspect who was handcuffed, surrounded by multiple officers, in a police station holding cell, and who did not pose either a threat to the officers or a threat of escape.  *See Casey*, 509 F.3d at 1286 (officer not entitled to qualified immunity notwithstanding lack of published decision holding taser use to be excessive because use of taser was unjustified in light of *Graham*); *Towsley v. Frank*, 2010 WL 5394837, at *11 (D. Vt. Dec. 28, 2010) (holding that *Tracy* made it clearly established that officer was not entitled to qualified immunity for taser use against suspect who was neither resisting nor fleeing arrest).  Accordingly, Slezak is not protected by qualified immunity in his decision to tase Bryant, and Egan is not protected by qualified immunity because a reasonable officer in his position would have known of his responsibility to intervene to prevent Slezak from tasing Bryant.

## IV.    Conclusion

For the foregoing reasons, Bryant's motion for judgment as a matter of law or, in the alternative, motion for a new trial (doc. # 141) is granted in part and denied in part.  The jury's conclusion that Bryant's Fourth Amendment rights were not violated at the scene of the arrest is neither unreasonable nor against the weight of the evidence.  The jury's conclusion that Bryant's Fourth Amendment rights were not violated when he was tased in the holding cell is against the weight of the evidence.  Moreover, the involved officers, Egan and Slezak, are not entitled to

qualified immunity on that claim.  A new trial of the claims against Egan and Slezak will be

scheduled at the earliest possible date.  Judgment in favor of the other officers is undisturbed.

     So ordered.

Dated at Bridgeport, Connecticut, this 31th day of March 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
